# In the United States Court of Federal Claims

No. 21-1626

(Filed Under Seal: September 10, 2021)

(Reissued:  September 17, 2021)

|  |  |  |
|---|---|---|
| **KINEMETRICS, INC.,** | ) | Post-award bid protest; the Department of |
|  | ) | Defense's pilot program for acquisitions |
| Plaintiff, | ) | of "innovative commercial items, |
|  | ) | technologies, and services;" National |
| **v.** | ) | Defense Authorization Act for Fiscal Year |
|  | ) | 2017, § 879, 130 Stat. 2312; jurisdiction; |
| **UNITED STATES**, | ) | standing; evaluation by peer review; |
|  | ) | exercise of discretion |
| Defendant, | ) |  |
|  | ) |  |
| **and** | ) |  |
|  | ) |  |
| **NANOMETRICS, INC.,** | ) |  |
|  | ) |  |
| Defendant-Intervenor. | ) |  |

Howard W. Roth, Oles Morrison Rinker & Baker LLP, Seattle, Washington for plaintiff, Kinemetrics, Inc.  With him on briefs were Meghan A. Douris and Ryan M. Gilchrist, Oles Morrison Rinker & Baker LLP, Seattle, Washington.

Evan Wisser, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for the United States.  With him on briefs were Brian M. Boynton, Acting Assistant Attorney General, Civil Division, Martin F. Hockey, Jr., Acting Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice.  Of counsel were Michael J. Farr, Senior Trial Attorney, Commercial Litigation Field Support Center, and David Charitat, Legal Advisor, Air Force Technical Applications Center, Air Force Judge Advocate General's Corps.

Joseph G. Martinez, Dentons US LLP, Denver, Colorado for Defendant-Intervenor, Nanometrics, Inc.  With him on brief was K. Tyler Thomas, Dentons US LLP, Denver, Colorado.

**OPINION & ORDER**[1]

LETTOW, Senior Judge.

The United States Department of the Air Force ("the Air Force" or "the agency") used a relatively novel procurement method to acquire seismic equipment for use in monitoring nuclear treaty compliance. Kinemetrics, Inc. ("Kinemetrics") protests the award and seeks a preliminary injunction. *See* Pl.'s Mot., ECF No. 2; Mem. in Support of Pl.'s Mot. ("Pl.'s Mem."), ECF No. 3. The United States has filed an opposition and a cross-motion to dismiss, *see* Def.'s Cross-Mot., ECF No. 26. The procurement at issue was instituted as a Commercial Solutions Opening ("CSO") Acquisition, which included an iterative initial proposal and a peer review process, with the result that a proposal by Nanometrics Inc. ("Nanometrics") was selected by the Air Force to receive an agreement. *See* Def.'s Cross-Mot. at 5, 9. Nanometrics has intervened as a defendant.

At the outset of the protest, the government asserted that Congress in adopting this type of acquisition process specifically exempted it from judicial review, Def.'s Cross-Mot. at 15-17, but the government has since conceded that the court has jurisdiction to evaluate whether the Air Force followed applicable CSO procedures. *See* Hr'g Tr. 49:4-19 (Aug. 20, 2021).[2] The court concludes that it maintains jurisdiction over the protest, but it can only evaluate whether the government followed its own process.

Notwithstanding Kinemetrics' claims of error, the agency's sophisticated evaluation for this technologically advanced project is subject to a high degree of judicial deference. In this instance, the court cannot overturn the results of the peer review of the proposals the Air Force received. Based on the documentary materials of record, the court has found no indication that the deference accorded the Air Force was abused.

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal. The court requested that the parties review the decision and provide proposed redactions of any confidential or proprietary information. No redactions were requested.

[2] The date will be omitted from further citations to the transcript of the hearing conducted on August 20, 2021.

As counsel for the government stated at the hearing on the cross-motions: "[T]his is a procurement . . . . [The CSO] authority was specifically designed to create [ ] a procurement methodology . . . [s]o it is within the general jurisdiction of the court. But . . ., we also have to give effect to Congress' specific direction to say this is going to be evaluated through a peer review process." Hr'g Tr. 49:12-19.

## BACKGROUND[3]

### A. Commercial Solutions Opening Agreements

The agreement protested in this case was issued as a Commercial Solutions Opening, a procurement method of limited application. Def.'s Cross-Mot. at 5. Title 10, Chapter 139 of the United States Code provides the authority for the Department of Defense to conduct acquisitions pertaining to research and development. *See* 10 U.S.C. ch. 139 ("Research and Development"). Specifically pertinent to this case, Section 2371 of Title 10 states that the respective leader of each military department "may enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection." 10 U.S.C. § 2371(a). This authority applies only to "basic, applied, and advanced *research projects*." 10 U.S.C. § 2371 (emphasis added). In 2015, Congress amended Title 10 to provide additional authority to the Department of Defense, adopting Section 2371b. *See* National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 815, 129 Stat. 726, 893. Section 2371b authorizes select individuals "under the authority of section 2371 of this title, [to] carry out *prototype projects* that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." 10 U.S.C. § 2371b(a) (emphasis added). The Section expressly provides that the Department could, but need not, award follow-on production contracts to participants in these projects. *Id.* § 2371b(f)(1). If certain conditions are met, such a production contract "may be awarded . . . without the use of competitive procedures." *Id.* § 2371b(f)(2). Pursuant to this other-transaction authority, the Defense Innovation Unit Experimental developed what it called a commercial solutions opening that begins with a broad "area of interest" announcement, followed by phased evaluations—*i.e.*, focused first on a high-level technical evaluation of expressions of interest, followed by more and more detailed evaluations as the procuring agency and responding interested party or parties developed a scope of work. *See* Defense Innovation Unit Experimental, *DIUx Commercial Solutions Opening How-to Guide* (Nov. 30, 2016), https://apps.dtic.mil/dtic/tr/fulltext/u2/1022451.pdf.

Late in 2016, Congress established the "defense commercial solutions opening pilot program," which permitted the military to "acquire innovative commercial items, technologies, and services through a competitive selection of proposals resulting from a general solicitation and the peer review of such proposals." National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 879(a), 130 Stat. 2000, 2312. Congress provided that the "[u]se of general solicitation competitive procedures for the pilot program . . . shall be considered to be use of competitive procedures for purposes of chapter 137 of title 10, United States Code." *Id.* § 879(b). Similar to the CSO approach developed by the Defense Innovation Unit Experimental,

---

[3] The government has not filed the administrative record. Therefore, the recitations that follow do not constitute findings of fact but rather are recitals attendant to the pending motions and reflect matters drawn from the complaint, the parties' briefs, and records and documents appended to the complaint and briefs. Nonetheless, with advance notice and the consent of the parties, extensive materials from what would constitute the administrative record have been submitted by the parties. *See infra*, at 7 & n. 7, 12 & n. 9.

the 2017 NDAA CSO pilot program created an acquisition structure "under which the Secretary [of Defense] may acquire innovative commercial items, technologies, and services." *Id.* § 879.[4]

### B. The CSO

The Air Force Technical Applications Center issued a Commercial Solutions Opening on March 13, 2020.  Am. Compl. Ex. 1, ECF No. 35-1.  The mission objective of the procuring agency is to "provide[] technical measurements to monitor nuclear treaty compliance and develop[] advanced nuclear proliferation monitoring technologies."  Def.'s Cross-Mot. at 3 (citing *Air Force Technical Applications Center Fact Sheet*, Sixteenth Air Force (Air Forces Cyber), https://www.16af.af.mil/About-Us/Fact-Sheets/Display/Article/1963049/air-force-technical-applications-center/ (last visited Aug. 30, 2021).  The Air Force initially sought "the best approaches to meet the technology objectives within" eight specified capability areas.  Am. Compl. Ex. 1 ¶ 2.1.[5]  On May 14, 2020, the agency issued an amendment to the CSO, opening a ninth topic which is at issue in this protest, seeking "new and innovative capabilities and technological advancements for the replacement of obsolete [geophysical field systems ("GFS")] seismometers and data acquisition system currently operating at 31 locations around the world," Am. Compl. Ex. 2 at Amend. 0001 ¶ 1, some of which have been installed in remote (and classified) locations.[6]  Each topic was accompanied by a description of the agency's needs and requirements, and the CSO noted that "[s]ubmissions should identify innovative solutions that fill capability needs . . . [and] can also directly improve the effectiveness or efficiency of operating and/or maintaining current . . . capabilities."  Am. Compl. Ex. 1 Attach. 6. Additionally, any award made pursuant to the CSO would "be in the form of contracts or other transactions . . . as codified in 10 U.S.C. § 2371b."  Am. Compl. Ex. 1 ¶ 3.1.

The CSO outlined the submission and evaluation process which would occur in two phases.  Am. Compl. Ex. 1 ¶ 5.  During Phase I, all interested offers could submit "Quad Charts and White Papers" prior to April 30, 2021.  Am. Compl. Ex. 1 ¶ 5.1.  Following review of the Phase I submissions, the agency would "invite select[ed] [o]fferors to submit full proposals

---

[4] Unless extended by Congress, a sunset clause provides that this authority expires September 30, 2022.  *See* Section 879(g), 130 Stat. 2313 ("The authority to enter into contracts under the pilot program shall expire on September 30, 2022.").

[5] These areas were (1) Geophysics and Seismology, (2) Air and Space, (3) Directed Energy Weapon, (4) Nuclear and Nuclear-Related Materials Analysis, (5) Materials Modeling and Analysis, (6) Enterprise Wide Integration and Architecture Modernization, (7) Enterprise Asset and Lifecycle Management Improvements, and (8) High Performance and Secure Cloud Computing and Dev Ops Solutions for Data Ingestion, Exploitation, and Dissemination.  Am. Compl. Ex. 1 Attach. 6.

[6] In essence, by adding the ninth topic, the Air Force sought to acquire technologically advanced seismic monitoring equipment for detecting and monitoring nuclear weapons testing conducted around the world by other nations.

Sensors are put down bore holes to measure seismic waves, and the resulting data from about 3,600 sensors is transmitted to one of the 31 aggregator locations.  Hr'g Tr. 53; 5-7.

based on favorable evaluation results of Phase I submissions." Am. Compl. Ex. 1 ¶ 5.1. For the ninth topic at issue in this protest, however, Amendment 0001 deviated from the two-phase proposal process outlined in the initial CSO. The amendment sought "not a call for white papers" but rather invited "[i]nterested parties [to] submit a complete technical and cost proposal." Am. Compl. Ex. 2 at Amend. 0001 ¶ 3. The proposals would be evaluated based on (1) technical merit/applicability, specifically the "ability to meet threshold capability requirements," (2) "[b]est approach to meet the technology objectives," (3) pricing, (4) "[d]elivery Order 0001" which included "[t]echnical [a]pproach and [p]rice," and (5) the availability of funds. Am. Compl. Ex. 2 at Amend. 0001 ¶ 5.5.1.3. All evaluation factors were "of equal importance." Am. Compl. Ex. 2 at Amend. 0001 ¶ 5.5.1.3. While the contracting officer would conduct the price analysis, the amendment indicated that all other evaluative steps would be conducted by "[p]eer and/or scientific review." Am. Compl. Ex. 2 at Amend. 0001 ¶ 5.5.1.3.

The agency received three proposals responding to the ninth topic, including ones from Kinemetrics and Nanometrics. Def.'s Cross-Mot. at 11; Hr'g Tr. 37:1-3. The Air Force "chose to fund a proposal submitted by Nanometrics" and "chose not to fund the proposal submitted by Kinemetrics." Def.'s Cross-Mot. at 11. The government's evaluation explained that "the Kinemetrics proposal met thresholds for core requirements[,] and the team determined it would have low technical risk." Am. Compl. Ex. 3 at 1. Additionally, it observed that "[m]ost of the products proposed by Kinemetrics would be deliverable within 90 days." Am. Compl. Ex. 3 at 1. It added, however, that "[o]ne significant observation from the team was that infrastructure changes would be necessary at each of the GFS sites to supply the electrical power required by the Kinemetrics equipment, which would ultimately increase the GFS life cycle cost." Am. Compl. Ex. 3 at 1. "Based on the above analysis," the evaluation concluded, "the Government determined the contractor's proposal [is] technically acceptable, but does not recommend a contract award." Am. Compl. Ex. 3 at 2.

## C. Procedural History

Kinemetrics filed a protest at the Government Accountability Office ("GAO") on May 10, 2021. Am. Compl. ¶ 56. The Air Force filed a motion to dismiss Kinemetrics' protest as untimely, Am. Compl. ¶ 58, and Kinemetrics subsequently withdrew that protest, Am. Compl. ¶ 59. Kinemetrics then filed its complaint in this court on July 28, 2021, along with a motion for a preliminary injunction. *See* Compl.; Pl.'s Mot.; Pl.'s Mem. Plaintiff challenged the Air Force's evaluation as violating the Competition in Contracting Act and relevant regulations. Am. Compl. ¶¶ 62-85. Specifically, Kinemetrics objected to the agency's assessment that Kinemetrics' proposal required "infrastructure changes . . . at each of the GFS sites to supply the electrical power required by Kinemetrics equipment, which would ultimately increase the GFS life cycle cost" and which "would require the program office to manage or accept external cost and schedule risks due to required changes for power infrastructure at the field sites." Am. Compl. ¶¶ 1-2 (internal quotations omitted). The government's cross-motion to dismiss responded to Kinemetrics' motion. Def.'s Cross-Mot. The cross-motions have been fully briefed, *see* Def-Int. Nanometrics' Resp., ECF No. 27; Pl.'s Resp. and Reply, ECF No. 32; Def.'s Reply, ECF No. 33, and the court held a hearing on August 20, 2021. On August 30,

2021, the court denied Kinemetrics' motion for a preliminary injunction, advising that an opinion would follow in due course. *See* Order of August 30, 2021, ECF No. 40.

## STANDARDS FOR DECISION

### A. Jurisdiction

The Tucker Act provides this court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The plaintiff must establish jurisdiction by a preponderance of the evidence. *See Trusted Integration, Inc. v. United States,* 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir. 1988)).

### B. Standing

The plaintiff has the burden of establishing standing to bring a bid protest. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "A party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To satisfy these more stringent requirements, a plaintiff must show that it is an "interested party," *see Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)), and "that it was prejudiced by a significant error in the procurement process," *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citing *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002)).

An interested party is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Weeks Marine*, 575 F.3d at 1359 (quoting *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). To have a direct economic interest, the plaintiff must show that it had a substantial chance of winning the contract. *See Digitalis*, 664 F.3d at 1384. An interested party suffers prejudice from a significant procurement error when "but for the error, it would have had a substantial chance of securing the contract." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (emphasis omitted) (quoting *Labatt*, 577 F.3d at 1378); *see also Red Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 21 (2019), *aff'd*, 840 Fed. Appx. 529 (2020). The prejudice inquiry and the economic-interest inquiry must not be conflated—"an error [may be] non-prejudicial to an economically interested offeror." *CliniComp*, 904 F.3d at 1358 (quoting *Labatt*, 577 F.3d at 1379-80); *see also Veteran Shredding, LLC v. United States*, 140 Fed. Cl. 759, 765 (2018) ("Despite the potential relevance of prejudice in determining substantial chance, direct economic interest should still be evaluated separately from prejudice."). "A party cannot be prejudiced unless it first has a substantial chance of [obtaining the] award." *Veteran Shredding*, 140 Fed. Cl. at 765.

*C. Failure to State a Claim*

Under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

In evaluating the government's motion to dismiss for failure to state a claim, the court notes that this aspect of the government's cross-motion is akin to a motion for judgment on the administrative record and that a formal administrative record has not been filed. Key elements of that record have nonetheless been submitted by Kinemetrics in connection with its complaints and briefs and by the government in connection with the briefs. Those submissions took into account the extensive discussion at the initial conference held in this protest that the government intended to file a cross-motion to dismiss. *See* Hr'g Tr. 6:21 to 7:17 (July 30, 2021).[7] The question before the court in evaluating this aspect of the case is whether the parties consented to adjudicate a motion to dismiss in the absence of the filing of a certified, complete administrative record and whether appropriate portions of the administrative record before the Air Force have been provided such that the court may address the merits of the government's motion. Those questions will be resolved *infra*, at 12 & n. 9.

**ANALYSIS**

*A. Jurisdiction*

The bid protest provisions of the Tucker Act are "exclusively concerned with procurement solicitations and contracts." *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 439 (2019) (quoting *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010)). In short, the court's bid protest jurisdiction is limited to those that are "in connection with a procurement or a proposed procurement," *id.* (quoting 28 U.S.C. § 1491(b)(1)). Although "the operative phrase 'in connection with' is very sweeping in scope," *id.* (brackets omitted) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)), governmental actions have fallen outside the court's bid protest jurisdiction where they "did not begin 'the process for determining a need for property or services,'" "had no effect upon the award or performance of any contract," and were "of a developmental nature," *id.* at 440 (citations omitted). Consequently, the court lacks protest jurisdiction where other-transaction solicitations are "separate and distinct" from procurement solicitations. *Id.* at 442-45 (holding that an other-transaction solicitation to develop space launch infrastructure was not "in connection with" a future, contemplated procurement solicitation for space launch services

---

[7] As counsel for the protestor stated, "the issue in the protest is extremely narrow," Hr'g Tr. 8:3-4 (July 30, 2021), and that "some type of limited agency record" should be provided, *id.* at 8:2-3.

because rejection under the former did not preclude consideration under the latter, rendering the latter "separate and distinct").

In this instance, Delivery Order 0001—for equipment configured to work at the ILAR seismic station at Eielson Air Force Base, Alaska—was included in the opening CSO itself. *See* Am. Compl. Ex. 2 ¶ 5.3.3. Further, the technical evaluation letter that the agency sent to plaintiff to inform it of the rejection of its proposal recommended against awarding a contract. *See* Am. Compl. Ex. 3 at 2. ("Based on the above analysis, the Government determined the contractor's proposal is technically acceptable, but does not recommend a contract award."). Unlike the facts of *Space Exploration Technologies*, where no procurement contract was contemplated, this solicitation had a direct effect on the award of a contract. This solicitation resulted in a standard indefinite delivery, indefinite quantity contract for GFS equipment from Nanometrics. The CSO and the resulting technical evaluation were not "separate and distinct" from the decision to procure from an offeror or another because, unlike *Space Exploration Technologies*, rejection in the evaluation phase did disqualify plaintiff from consideration for the follow-on production contract contemplated by the CSO.

Accordingly, the court concludes that it has jurisdiction to review this CSO because it was "in connection with" a procurement.

### B. Standing

Intervenor raises the issue of plaintiff's standing to bring this bid protest. Def.-Int.'s Resp. at 3-5. Specifically, it argues that unlike "a traditional competitive acquisition," where "offerors compete against one another for the award of the resulting contract," proposals in a CSO "need not be evaluated against each other," and CSOs resemble broad agency announcements (which arguably do not give a disappointed offeror standing). *Id.* at 3-4. Therefore, intervenor reasons, "Kinemetrics has no basis to challenge the Air Force's decision to award a contract under the CSO acquisition to any other offeror, including the contract to Nanometrics." *Id.* at 4. Additionally, it contends that Kinemetrics lacks standing because the CSO permitted the agency to award to multiple awardees, *Id.* at 4-5 (quoting *Microcosm, Inc.*, B-277326, *et al.*, 97-2 CPD ¶ 133 (Comp. Gen. Sept. 30, 1997)). The court disagrees.

Kinemetrics was one of three companies that responded to the solicitation in question. Hr'g Tr. 37:1-2. The government's evaluation determined that plaintiff's proposal was technically sufficient and within available funds. Am. Compl. Ex. 3. Regardless of whether plaintiff's proposal was compared with intervenor's or whether the agency could have awarded to multiple offerors, Kinemetrics actually submitted a proposal that was found technically sufficient. Its proposal was rejected because the government determined that Kinemetrics' proposed power draw requirements were too high. But for the government's power evaluation, plaintiff—one of three companies that responded to the agency's CSO and whose proposal was found technically sufficient—had a substantial chance of winning the award of the contract. Therefore, the court concludes that Kinemetrics has standing to bring this protest.

*C. Failure to State a Claim*

The government contends that Kinemetrics failed to state a claim upon which relief can be granted because its two primary arguments—that the agency considered unstated evaluation criteria and that its technical evaluation was irrational—arose because of the results of the Air Force's peer review and thus were within the agency's discretion.  Def.'s Cross-Mot. at 17-21. The key question is whether plaintiff's contentions "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

*1. Unstated evaluation criteria.*

First, Kinemetrics claims that the Air Force considered unstated evaluation criteria when it took account of "(1) whether there was any external cost; (2) schedule impacts; and (3) the supply of power and/or power infrastructure."  Pl.'s Mem. at 3.  The government responds that the solicitation "disclosed that [the agency] would broadly evaluate whether proposals present the '[b]est approach to meet the technology objectives.'"  Def.'s Cross-Mot. at 17 (ellipses omitted) (citing Compl. Ex. 3 ¶ 5.5.1.3).  At the hearing, counsel for the government explained that power draw—and related cost and scheduling impacts—was "not necessarily an element of the equipment's capability," Hr'g Tr. 47:6-7; instead, "it is relevant to whether [Kinemetrics' proposal] meets the second criteria, the overall best approach to meet the technology objectives[. B]ecause it's not that it would be impossible for Air Force to accommodate different power draws[;] it would just take different work on the agency side of things."  Hr'g Tr. 48:2-7. Plaintiff maintained in its reply that cost, schedule, and power infrastructure were technical evaluation criteria because that "is where this whole issue of power draw is addressed by the [g]overnment in what's been produced."  Hr'g Tr. 58:17-18.

Agencies "may consider elements that, while not explicitly stated in the solicitation, are 'intrinsic to the stated factors.'" *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020) (quoting *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 531 (2010)).  They "retain 'great discretion' in determining the scope of a given evaluation factor."  *Id.* (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)).  Plaintiff "must show that the procuring agency used a 'significantly different basis in evaluating the proposals than was disclosed' in the solicitation."  *Id.* (quoting *PlanetSpace*, 92 Fed. Cl. at 536-37).  "Best approach" is a broad criterion, and Kinemetrics has not attempted to show, much less actually shown, that the amount of work its proposal would require of the agency to accommodate the power draw of its equipment is outside the scope of this evaluation factor.  Kinemetrics points out that power infrastructure was a topic of concern during the question-and-answer phase of the solicitation, *see* Pl.'s Mem. at 9, but that itself undermines any concern that power draw was

"significantly different" from what the agency disclosed or from what plaintiff could have contemplated, *Poplar Point*, 147 Fed. Cl. at 219.[8]

The court concludes, therefore, that the agency did not abuse its discretion in determining that power draw and its implications were within the scope of "[b]est approach."

### 2. Rational basis for the government's evaluation.

Second, Kinemetrics argues that the agency's "evaluation determined incorrectly that [its] equipment required an infrastructure change to connect to [g]overnment power" and that "[t]here is no rational basis for the [g]overnment's determination." Pl.'s Mem. at 15. Defendant responds that plaintiff's argument asks the court to second-guess the agency's technical expertise, *see* Def.'s Cross-Mot. at 18 ("Kinemetrics' other claim is that [the agency] was 'technically incorrect' when it determined that installing Kinemetrics' equipment would require changes to the local power infrastructure."), which it claims is outside the court's competence to address, *see id.* at 19 ("Courts have long recognized that the merits of an agency's expert technical and scientific decisions are committed to agency discretion and unreviewable, particularly where the agency's decisions result from a technical or scientific peer review process.") (citing *Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) (other citations omitted)). Kinemetrics replies that "[n]o technical expertise is needed to know . . . that the evaluation was irrational in that it contradicted its own terms." Pl.'s Reply at 17. It contends that the government's analysis does not match its stated conclusion for rejecting plaintiff's proposal. *Id.* at 15-16 ("The [g]overnment's evaluation rejecting Kinemetrics gives a single reason for rejecting Kinemetrics—that the power infrastructure will need to be upgraded, thus creating the risk of external cost. The evaluation eighth system capability does not state that the infrastructure will need to be upgraded and no analysis is provided regarding any external cost risk.").

"In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4), which adopts the standard of 5 U.S.C. § 706). "[A]n agency's decision [is] arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The arbitrary and capricious standard applicable in bid protests is highly deferential." *Glenn*

---

[8] The power draw of the equipment proffered by each of the three who responded to the solicitation was extensively evaluated in studies performed by Sandia National Laboratories. *See* Def.'s Cross-Mot. Ex. 2, Sandia Report (Mar. 2020) at 3, 15 (analyzing power consumption). Earlier in 2018, Sandia National Laboratories had evaluated equipment provided by Kinemetrics and Nanometrics, along with that of other possible providers. *See* Am. Compl. Exs. 2, 3, Sandia Reports on Kinemetrics and Nanometrics (Oct. 2018), ECF Nos. 35-2 and 35-3.

*Defense Marine*, 720 F.3d at 907 (brackets omitted) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)) (alterations in original).

Inasmuch as Kinemetrics challenges the correctness of the government's technical evaluation, the court defers to the agency's expertise, especially in the context of a peer-review process regarding specialized, scientific equipment and available resources at a variety of locations, some of which are remote. *See Terex Corp. v. United States*, 104 Fed. Cl. 525, 532 (2012) ("[W]here the resolution of an issue 'requires a high level of technical expertise,' it is 'properly left to the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). The agency is better situated than the court to know what its power infrastructure can deliver at the 31 monitoring sites, as well as the hurdles and level of effort required to implement changes to that infrastructure based on plaintiff's proposal.

Nonetheless, Kinemetrics asserts that the government's evaluation process "was irrational and unsupported by evidence." Pl.'s Reply at 13; *see also* Hr'g Tr. 16:19-24 ("[W]ithout getting into the technical [details], there doesn't seem to be a rational basis because they were talking about external costs and schedule risks, but there was no evaluation of what would the additional costs be."). This contention runs counter to the Air Force's evaluation letter, which states that "infrastructure changes would be necessary at each of the GFS sites to supply the electrical power required by the Kinemetrics equipment, which would ultimately increase the GFS life cycle cost." Am. Compl. Ex. 3 at 1. Although the letter does not offer any details to explain this observation, that does not demonstrate that the government acted arbitrarily or capriciously by offering an explanation that is inconsistent with the evidence. The evaluation letter's brief explanation indicates, to the contrary, that the agency did consider the impact that power draw would have on the overall objectives of the acquisition. *See* Am. Compl. Ex. 3 (observing that "[m]ost of the products proposed by Kinemetrics would be deliverable within 90 days" but then raising the issue of "infrastructure changes").

Moreover, the court cannot say the agency's explanation is counter to the evidence without substituting its judgment for the agency's on a technical question, which it may not do. The Air Force conducted market research in 2018 prior to issuing the solicitation at issue here, and this research produced reports on both Kinemetrics' and Nanometrics' available equipment (totaling 217 pages for the report on Kinemetrics' equipment and 185 pages for Nanometrics'). Am. Compl. Ex. 7. Those reports specifically addressed power draws. *Id.* This market research was then followed by peer review of Kinemetrics' and Nanometrics' proposals pursuant to the solicitation. To conclude that the agency's explanation concerning power draw and cost and schedule risks is contrary to that evidence would require the court to second-guess evidently extensive expert engineering research on the agency's part over the span of several years. The narrowness of the court's review does not permit such reanalysis in the context of nuclear event detection in pursuit of national security. *Cf. PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 356 (2010) ("[T]his court has neither the legal authority nor the institutional competence to substitute its judgment for that of an administrative agency in an area as committed to agency expertise and discretion as the assessment of risks to human health and safety from radioactive and other hazardous materials contamination.").

On the record before this court, there is no indication that the agency acted arbitrarily, capriciously, in abuse of its discretion, or otherwise not in accordance with law. The question becomes whether that record is adequate to allow the court to rule on the government's motion to dismiss for failure to state a claim. Ordinarily, the materials provided, although key to the procurement, would not suffice because the record is not complete and is not certified. *See Banner Health v. Sebelius*, 797 F. Supp. 2d. 97, 112 (D.D.C. 2011) (recognizing "the dangers associated with proceeding with judicial review 'on the basis of a partial and truncated record' without the consent of the parties") (quoting *Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291-92 (D.C. Cir. 1975)). In this instance, however, the court did have the consent of the parties. *See supra*, at 2 n. 2 (noting that, at the initial conference in this protest, the parties advised that the issues presented would be "extremely narrow," that a "limited agency record" should be provided, and that time was pressing because of the nature of the procurement. Hr'g Tr. 8:3-10 (July 30, 2021)). Both parties supplied extensive agency records with their filings, including voluminous reports of findings regarding the proffered technologies and the agency's peer review results. As a result, with the parties' consent, given in advance of briefing the cross-motions, the court may act to resolve the merits.[9]

## CONCLUSION

For the reasons stated, the court GRANTS defendant's motion to dismiss for failure to state a claim.[10]

The Clerk is directed to enter judgment in accord with this disposition.

No Costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[9] Absent the parties' consent, the court would not have been able to act in this bid protest on the government's motion to dismiss for failure to state a claim. It would have been limited to jurisdictional issues as a basis for a motion to dismiss. *See M.R. Pittman Group, LLC v. United States*, ___ Fed. Cl. ___, ___, 2021 WL 2588095, at *2, 4 (June 24, 2021) (granting a motion to dismiss on jurisdictional grounds in reliance on RCFC 12(h)(3), which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").

[10] As noted, *see supra* at 5-6, the court earlier had denied Kinemetrics' motion for a preliminary injunction.